**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  07-20577-CR-HUCK/SIMONTON**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**ALI LOUIS ADAM,**

      **Defendant.**

_____/

**CASE NO.  07-22173-CIV-HUCK/SIMONTON**

**ALI LOUIS ADAM,**

      **Petitioner,**

**v.**

**JOHN RATHMAN, Warden,**
**Federal Detention Center Miami,**

      **Respondent.**

_____/

**REPORT AND RECOMMENDATION ON DEFENDANT ADAM'S MOTION**
**FOR IMMEDIATE RELIEF FROM SOLITARY CONFINEMENT AND**
**FOR MODIFICATION OF HIS CONDITIONS OF PRETRIAL DETENTION**
**AND ON ADAM'S PETITION FOR A WRIT OF HABEAS CORPUS**

      Presently pending before the Court are Defendant Ali Louis Adam's (hereafter

Adam) Motion For Immediate Relief From Solitary Confinement and For Modification of

His Conditions of Pretrial Detention (07-20577-CR-HUCK, DE # 19), and Adam's Petition

For a Writ of Habeas Corpus (07-22173-CIV-HUCK, DE # 1).  These matters are referred to

the undersigned Magistrate Judge (07-20577-CR-HUCK, DE # 4; 07-22173-CIV-HUCK, DE

# 21).  The motion for relief from solitary confinement is fully briefed (07-20577-CR-

HUCK, DE ## 29, 32).  The United States has responded in opposition to the petition (07-

22173-CIV-HUCK, DE # 7).  Adam has not replied and the time do so has run.  On August 20, 2007, September 12, 2007, September 27, 2007, October 4, 2007 and October 12, 2007, the undersigned held a hearing on these matters. At the September 12, 2007 and October 12, 2007 hearings, the parties presented evidence.  For the reasons stated below, it is recommended that Adam's requests for relief be denied.

I. <u>Introduction</u>

Defendant Adam is a pretrial detainee in the Federal Detention Center (hereafter FDC), Miami.  Adam is awaiting trial on a multi-count indictment charging him engaging in a continuing criminal enterprise, along with other drug and money laundering charges.  Adam has been placed in administrative segregation in the Special Housing Unit (hereafter SHU), at FDC Miami.  The administration of FDC Miami has received information that the Mexican Mafia has placed a contract on Adam's life, and has taken the position that placing Adam in the general population would constitute a danger to the life and safety of Adam, other inmates and the institution's staff.   In the instant proceedings, Adam asks to either be placed in the general population or, in the alternative, to receive more privileges while he is in SHU regarding: 1) contact with other inmates; 2) the area where he can take recreation; 3) the equipment available for his recreation; 4) telephone privileges more in line with the telephone privileges given to inmates in the general population; 5) access to the law library in general population; and 6) access to a television.

II. <u>Procedural History</u>

On June 21, 2007, the grand jury filed a sealed one-count indictment charging Adam and a co-defendant with conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21

U.S.C. § 846 (07-20577-CR-HUCK, DE ## 1, 12).[1]

On July 3, 2007, Adam was arrested in Los Angeles, was held in pretrial detention, in the general population, and was subsequently removed to this District (07-20577-CR-HUCK, DE # 6).  On July 24, 2007, Adam arrived at FDC Miami (07-20577-CR-HUCK, DE # 8).  On July 25, 2007, at his initial appearance, Adam remained in pretrial detention (07-20577-CR-HUCK, DE # 11).

On August 8, 2007, Adam moved for immediate relief from solitary confinement and for modification of his conditions of pretrial detention (07-20577-CR-HUCK, DE # 19). This motion was referred to the undersigned Magistrate Judge (07-20577-CR-HUCK, DE # 21).  On August 15, 2007, the undersigned entered an Order that the government file a response by August 21, 2007 (07-20577-CR-HUCK, DE # 23).  Also on August 15, 2007, Adam filed an emergency motion for a hearing on his motion (07-20577-CR-HUCK, DE # 24).  On August 16, 2007, the undersigned entered an order granting in part the motion for a hearing, and directed the parties to be prepared to discuss whether: 1) an evidentiary hearing was requested; 2) the Court's jurisdiction was limited to whether Petitioner had an adequate opportunity to confer with his counsel; 3) Adam had to raise his other claims in a habeas corpus petition; and 4) the Court could enter an Order on the motion or should enter a Report and Recommendation (07-20577-CR-HUCK, DE # 26). On August 20, 2007, the undersigned heard argument on the motion (07-20577-CR-HUCK, DE # 28). On August 21, 2007, the government filed its response to the motion (07-20577-CR-HUCK, DE # 29).  On August 23, 2007, Adam filed his reply in support of his motion for relief from solitary confinement (07-20577-CR-HUCK, DE # 32).

---

[1] The indictment was unsealed on July 25, 2007 (07-20577-CR-HUCK, DE # 7).

3

Also on August 21, 2007, Adam filed a Petition For A Writ of Habeas Corpus under 28 U.S.C. § 2241, asking that he be relocated from solitary confinement into the general population (07-22173-CIV-HUCK, DE # 1).

On September 7, 2007, Adam filed a supplemental motion for an evidentiary hearing on his motion for relief from solitary confinement (07-20577-CR-HUCK, DE # 42). The undersigned granted the motion to hold an evidentiary hearing (07-20577-CR-HUCK, DE # 42).

On September 11, 2007, the habeas corpus petition was referred to the undersigned Magistrate Judge (07-22173-CIV-HUCK, DE # 4).  On September 11, 2007, the undersigned entered an order in each case stating that at the September 12, 2007 hearing on Adam's motion, the parties should be prepared to discuss the habeas corpus petition and whether the proceedings should be consolidated (07-22173-CIV-HUCK, DE # 5; 07-20577-CR-HUCK, DE # 46).

On September 12, 2007, the undersigned held an evidentiary hearing on Adam's Motion For Immediate Relief From Solitary Confinement.  At this hearing, Adam's then-counsel, Howard Srebnick, Esq. and counsel for the government, AUSA Todd Mestepy, agreed to consolidate the proceedings on the habeas corpus petition and the motion for immediate relief from solitary confinement.  Attorney Srebnick also stated at the hearing that he was going to withdraw as Adam's counsel.[2]  Assistant Federal Public Defender Helene Batoff, Esq. was present at the hearing and was appointed as Adam's new counsel.  The evidentiary hearing was not completed on that date and was continued to

---

[2] Attorney Srebnick subsequently filed a notice that he was withdrawing his representation of Adam in the criminal case (07-20577-CR-HUCK, DE # 55), and moved to withdraw his representation of Adam in the habeas corpus (07-22173-CIV-HUCK, DE # 10), which motion was granted (07-22173-CIV-HUCK, DE # 11).

September 24, 2007 at 2:00 p.m. (07-20577-CR-HUCK, DE ## 47, 49).

On September 18, 2007, the government filed its response to the habeas corpus petition (07-22173-CIV-HUCK, DE # 7).

On September 24, 2007, the scheduled hearing was held.  The Federal Public Defender moved to withdraw based on a conflict.  The motion was granted and CJA Attorney Martin Feigenbaum, Esq. was appointed to represent Adam in both cases (07-20577-CR-HUCK, DE ## 63, 64; 07-22173-CIV-HUCK, DE # 11).  The hearing was continued until September 27, 2007 (07-20577-CR-HUCK, DE ## 58, 59; 07-22173-CIV-HUCK, DE ## 12, 15).

On September 27, 2007, the scheduled hearing was held.  At the request of both parties, no evidence was taken, and the hearing was continued (07-20577-CR-HUCK, DE # 65; 07-22173-CIV-HUCK, DE # 16).

On October 11, 2007, a twenty-seven count superseding indictment was returned against Adam and five others.  Adam was charged: with engaging in a continuing criminal enterprise, by numerous violations of 21 U.S.C. § 841(a)(1), in concert with at least five other persons with respect to whom Adam occupied a position of organizer, supervisor and manager, all in violation of 21 U.S.C. § 848 (Count 1); conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846 (Count 2); five separate counts of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts 3 through 7); conspiracy to launder money, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), all in violation of 18 U.S.C. § 1956(h) (Count 8); and five counts of money laundering, in violation of 18 U.S.C. § 1956(a) (Counts 9 through 13) (DE # 84).

On October 12, 2007, a further evidentiary hearing was held.  At the conclusion of

the hearing, the parties requested to be allowed to file post-hearing memoranda. Adam's memoranda was due on or before October 19, 2007 and the government's response was due five business days after Adam's memorandum was filed (DE # 100).

On October 31, 2007, the Court entered an order granting the government's motion to continue the trial, stating that Adam's trial would be reset to begin sometime between January 7, 2008 and April 7, 2008 (DE # 142).

## II. The Parties' Positions

### A. Adam's Position

Adam contends that since his arrival at FDC Miami, he has been held in the Special Housing Unit (SHU) under punitive conditions of confinement which are dangerous to his mental and physical well-being.  Adam alleges that his segregation in the SHU is diminishing his mental state, making his interaction with his attorney very difficult.  Specifically, Adam states that he lacks interaction with other inmates, access to recreational facilities available to other inmates, standard telephone communications privileges enjoyed by other inmates, access to television and other diversions available to the general population, and confinement to a locked cell for nearly the entire day (DE # 127 at 4, n. 6).  Adam believes that his conditions of incarceration are being used by the government to depress him so that he will either enter a plea or be less effective at trial.  Adam, a pretrial detainee, notes that the conditions of his confinement may not be punitive or excessive in relation to another legitimate government goal.

Adam further relies on the Bureau of Prison's (hereafter BOP), failure to follow and implement its own regulations as grounds for this Court to grant immediate relief as to Adam's unwarranted confinement in the SHU.

Adam notes that 28 C.F.R. § 541.22 states that an inmate housed in administrative

6

detention shall receive the same general privileges given to inmates in the general population.  Adam contends that he is locked in his cell, by himself, for 23 hours a day, with 15 minutes of telephone access per week, and with limited access to the commissary.  While he may have one hour of recreation, it occurs at 5:00 a.m., in an empty room.  By contrast, inmates who are in the general population have 75 minutes a week of telephone privileges, have access to a television for most of the day, may interact with other inmates in a much larger recreation area, and have access to a greater range of items from the commissary.  Adam seeks access, several times a week, and for one and one-half hours a day, to a recreation room which contains exercise equipment, a television and a telephone.

Adam states that the parties agree that his confinement in the SHU is administrative only and is not related to any allegations that he deserves SHU confinement as punishment for his conduct, and that the government has neither alleged nor offered any proof that Adam poses a threat to others at FDC Miami (DE # 127 at 3).

Adam further states that, at the time of the October 12, 2007 hearing, the government identified only three inmates at FDC Miami who were members of the Mexican Mafia and who might be a threat to Adam (DE # 127 at 4).  Adam asserts that FDC Miami could enter separation orders which would keep these three individuals from coming into contact with Adam (DE # 127 at 4-5).  Adam also contends that the other gang members whom the government asserts may carry out the Mexican Mafia's contract on Adam circulate in FDC Miami's general population with no apparent concern that they will do violence to other inmates (DE # 127 at 4).

Adam contends that he has pursued administrative remedies to resolve the issue, but that he was informed he was placed in administrative detention due to security

concerns regarding a threat to Adam's life.[3]  Adam contends that any further effort to pursue administrative remedies would be futile, as by the time he exhausted his administrative remedies, his trial would be over.  Adam also contends that he is entitled to judicial relief now notwithstanding his ongoing efforts to obtain relief by exhausting his administrative remedies, because there is no real possibility that he will be released into the general population (DE # 127 at 2, 4).[4]  Adam contends that the government has not and will not be taking any steps to ascertain whether there is alleged contract on his life from the Mexican Mafia still is in force (DE # 127 at 4).

B.  **The Government's Position**

Initially, the government contends that this Court does not have jurisdiction over Adam's claims because Adam has not exhausted his administrative remedies.  The government alleges that Adam has not appealed from the warden's October 5, 2007 denial in part of Adam's formal request for administrative review by the warden, Form BP-9.

Even assuming that the Court does have jurisdiction, the government asserts that Adam is properly in administrative detention because the Mexican Mafia has authorized a "hit" on Adam, which causes a danger to Adam, FDC Miami staff and other FDC Miami inmates, and to the secure and orderly operation of the institution.  The government also

---

[3] At the September 27, 2007 hearing, Adam's counsel represented that Adam had filed a Form BP-9 in mid-September.  At the October 12, 2007 hearing, the parties agreed that the warden had responded to Adam's BP-9 on October 5, 2007, denying Adam's request for release into the general population, but granting Adam some of the other relief he requested.  Adam's counsel stated that Adam intended to appeal from the warden's denial.

[4] Adam further states that although a constitutional violation may not have ripened as a ground for relief at this time, he does not waive his right to assert a constitutional violation in the future (DE # 127 at 2).

notes that the evidence in the record shows that FDC Miami is a transient facility and that it is not only members of the Mexican Mafia who might do harm to Adam, but also inmates affiliated with other gangs might do harm to Adam to curry favor with the Mexican Mafia.  The government contends that, at most, Adam has established that his placement in administrative detention is restrictive, but that being subject to restrictive and uncomfortable conditions does not amount to punishment.  The government asserts that Adam's placement in administrative detention is, therefore, not punitive, but is related to a legitimate government interest.

As further evidence that Adam's placement in administrative detention is not punitive, the government states that while Adam is in administrative detention, he may possess a radio, access reading material, and purchase some commissary items.  Adam has access to legal visiting, legal calls and a law library, is receiving vegetarian meals, and can and has purchased canned fish from the commissary.[5]  He is permitted to make one social telephone call per week.  He can take recreation for an hour a day starting between 7:30 and 8:00 a.m.

### III.  The Evidence Presented

### A.  Undisputed Facts

At the September 12, 2007 hearing, the parties agreed that the following facts were not in dispute.  Adam has been in administrative segregation since July 24, 2007.  Adam lives in a small, single cell, approximately eight feet by twelve feet for twenty-tree hours a day.  He has one hour a day of recreation, alone, in a slightly larger room which has access to air and sunlight.  He has no access to other prisoners, board games or

---

[5] In his initial motion, Adam asserted the deprivation of these rights as part of his claim for relief.

television.  He has a battery powered radio.  He has access to his counsel, but is locked

into a visitor room with his counsel for visits.  When Adam wants to make a telephone

call, he has to get a counselor to bring him a telephone.  Adam is permitted one personal

telephone call a week for a maximum of fifteen minutes.  He can't have bottled water.

FDC inmates in the general population have three hundred minutes of telephone

privileges a month, with routine access to a telephone.  General population inmates use

a recreation facility the size of a basketball court to shoot a basketball, play handball,

exercise or socialize.

### B.  Testimony of Captain Edward Felz

Captain Felz is the chief of correctional services at FDC Miami.  He testified at the

September 12, 2007 hearing, and the undersigned finds that his testimony was credible.

When Adam arrived at FDC Miami, Captain Felz made the decision to place Adam

in the SHU based on documents he received from the FBI liaison, Special Agent Cesar

Villafana, which contained information from the Los Angeles Police Department that the

Mexican Mafia had placed a contract on Adam's life.[6]  Subsequently, a member of the

Miami FDC special investigative service (hereafter SIS), independently contacted the

LAPD, and the LAPD confirmed the information with more facts but not in great detail.

Specifically, the information was that in 2005, during a drug transaction, Adam

was involved in an execution-style murder of a Mexican Mafia member in Los Angeles,

and as a result, the Mexican Mafia had placed a contract on Adam's life.  The documents

stated that the information came from a credible source.  Captain Felz noted that he had

no personal knowledge concerning any of this information, but that he relied on

---

[6] Captain Felz testified that FDC Miami received the information on July 18, 2007
at 2:23 p.m.

information he received.  Felz was not aware of any information that Adam had actually committed the murder.  Felz testified that SIS had only six investigators in Miami, and was unable to independently investigate the threat to Adam.  Felz has not done any investigation into Adam's profile in the community since 2005.

Captain Felz placed Adam in the SHU in administrative detention for his protection and for the protection of other inmates and staff.  Felz testified that he had a SIS background and was familiar with the Mexican Mafia.  Felz believes that the threat to Adam is very real and that the Mexican Mafia is able to reach out to FDC's around the country to have someone killed.  Felz opined that if Adam was in the general population, and was attacked there, he would have little chance to escape in the confined general population setting.  Felz testified that when Adam lived in the Los Angeles area, he was probably aware of where he could safely travel to avoid the Mexican Mafia.  Felz assumed that Adam had the protection of other individuals who would have been careful of where they traveled, but testified that he did not know whether Adam had traveled with an entourage in Los Angeles.[7]

Captain Felz also noted that FDC Miami is a transient facility, and the next person who walked into receiving and discharge could be the person who was a threat to Adam.  Felz then testified that there were Mexican Mafia inmates at FDC Miami, and that some were in the SHU and others in general population.  Felz stated that Mexican Mafia members were frequently in general population.  Felz opined that there were probably more Mexican Mafia members in FDC Los Angeles than in FDC Miami.  Felz did not know

---

[7] In placing Adam in the SHU, Captain Felz also testified that he relied on Adam's local activities, that Adam was charged with playing a key role in a local drug trafficking organization, as well as Adam's disruptive and violent history.  Felz obtained from the BOP system the information about Adam's current charges and criminal history.

why Adam had been placed in the general population in FDC Los Angeles, and did not have any information that any Mexican Mafia members threatened Adam in FDC Los Angeles.  Felz stated that many inmates charged with drug trafficking, violent crimes and crimes involving firearms were in the general population in FDC Miami.

Captain Felz further testified that there is a program where some SHU inmates who have been or are expected to be in administrative detention for more than six months are allowed access to a special recreation room containing a telephone, a television and exercise equipment.  At present, Felz testified that seven inmates, who had not yet been tried, had access to the room twice a month, and two recently convicted inmates had access to the room three times a week.  Felz stated that the program was being discontinued because it demonstrated a disparity among inmates in the SHU, causing dissension and envy among the SHU inmates and because it was staff intensive.  Because Felz wanted to eliminate the special recreation room program, he would resist having Adam added to it.

There is a weekly review process every Wednesday, at which all inmates in the SHU, including Adam, are discussed.  The meeting is attended by all three unit managers, the disciplinary hearing officer, a special investigative service (hereafter SIS) member, and a member of the psychology department.  The warden is aware that Adam wants to be placed in the general population, but decides every week to keep Adam in the SHU.  Captain Felz has no reason to believe that the warden will change his mind unless the information changes.

Captain Felz testified that there is a commissary list for inmates, like Adam, who are in administrative detention and a much more restrictive list for inmates who are in disciplinary segregation.  For example, Felz stated that no inmate in the SHU is allowed

to have bottled water because the plastic bottles are used either to hold intoxicants or to hold urine or feces to throw at the staff.  If inmates in the general population use water bottles for these purposes, they are disciplined.

Captain Felz testified that there are several recreation cages in the SHU and that they do not have any exercise equipment, weights or basketball courts, but that they have sunlight and fresh air.  Felz noted that Adam had been turning down his recreation time.  He was allowed one hour a day, five days a week.  Exercise is from 6:00 a.m. to 2:00 p.m.

C.  Testimony of Lieutenant Brian Best

Lieutenant Best is the SHU lieutenant at FDC Miami, and has been in that position since December 2006.  He testified at the October 12, 2007 hearing, and the undersigned finds that his testimony was credible.

On or about July 27, 2007, roughly three days after Adam arrived at FDC Miami, Lieutenant Best conducted an initial review of Adam's placement to the SHU by interviewing Adam.  The next review of Adam's placement occurred four days later. After that, the reviews have occurred every seven days.  Best writes the reports.  Best has been involved with all the reviews of Adam's designation to the SHU.

After Lieutenant Best conducts each review of Adam, he discusses his recommendation with the captain.  The captain then makes the determination whether Adam can be placed in the general population.

Adam is in the SHU because of the threat on his life, and while Adam is in FDC Miami, there is a threat to his life as well as danger to other inmates and staff if Adam is placed in the general population.  While Lieutenant Best knows that Adam does not believe there is a threat to his safety, Best testified that the administration of FDC Miami,

13

and not Adam, is responsible for the security of FDC Miami.  As long as the threat on Adam's life remains and is still credible, Best will recommend that Adam stay in the SHU.

Lieutenant Best will not make the determination as to whether the threat still exists, that information would have to come from the captain or from SIS.  Best meets daily with the captain and with a representative of SIS.  Best does not know if anyone ever checks the information, but he believes that SIS will contact their sources to update the information.  Best does not ask for an updated report.  Best is aware that Adam does not want to be in the SHU.

In early October 2007, the warden told SIS to conduct a second threat assessment as to Adam.  The second threat assessment will contain an evaluation of whether the threat to Adam still exists.  The second threat assessment is meant to determine whether there is going to be a safety factor related to the threat and Adam's criminal history if Adam is convicted and sentenced, and also to determine whether the threat to Adam is limited to FDC Miami or would exist in any BOP institution.  Lieutenant Best does not know if any of the FDC Miami investigators have gone back to the sources in Los Angeles to determine whether the threat to Adam is ongoing.  Best does not know when the second threat assessment will be completed.

When Lieutenant Best received the information about the threat to Adam, he identified members of the Mexican Mafia in FDC Miami.  However, the threat to Adam was not limited to members of the Mexican Mafia.  The threat could be implemented by any inmate who is affiliated with any type of gang and who might be willing to carry out the threat on behalf of the Mexican Mafia.  There are typically members of different gangs who are either known to be violent or have committed violent acts in the past and some of these inmates are placed in the general population.  Some of these inmates go

14

straight to the SHU and then they are evaluated and placed.  Every inmate who enters FDC Miami has an initial interview before being released into the general population.

FDC Miami contains a transient population.  There are between ten and fifteen new inmates a day, every weekday, and between one and five new inmates every weekend day.  Although the majority of inmates housed at FDC Miami are pretrial detainees, there are also convicted inmates who return for hearings, and who may be gang affiliated.  FDC Miami is not set up to designate a specific area of general population for individuals who are not affiliated with a specific type of illicit activity, due to the frequent movement of inmates in and out.  Thus, FDC Miami is unlike a prison, where there is a fixed designated population that remains in one place for a lengthy period.

There is nowhere in the general population where Adam could be placed where FDC could assure that there are no Mexican Mafia or other gang members.  The last time Lieutenant Best checked, there were three members of the Mexican Mafia in FDC Miami.  While there are separation orders at FDC Miami, and Lieutenant Best could implement separation orders for the identified Mexican Mafia members at FDC Miami to keep them separate from Adam, this would not preclude a new inmate or an inmate who is affiliated with another gang from attacking Adam.  Best estimated that Adam would need to be separated from more than 50% of the inmates in FDC Miami for Adam to be safe.

In addition to the seven day review described previously, there is also a thirty day review of Adam's placement in the SHU.  The thirty day review is a psychological review and results in a written report that stays in the file.  Lieutenant Best was not present at the review, does not know which psychologist examined the report, and has not reviewed the report.  If there are any changes, the psychologist will notify Best verbally,

15

and Best has not received any verbal notifications.  If the psychologist thinks that Adam needs to be taken out of the SHU, he would inform the guards verbally and in writing. Captain Felz would then decide whether to remove Adam from the SHU.  Based upon a hypothetical psychologist's report, Adam's condition of confinement in the SHU might be modified.  For example, Adam might be prescribed medication and/or told to consult more frequently with the psychologist.

Lieutenant Best was not aware that one of the psychologists had prescribed medication for Adam.  Best would not get a notification if Adam was prescribed medication.

Lieutenant Best is not aware of any inmate besides Adam who has gone through the process of administrative remedies to be released from the SHU.  The warden has denied Adam's formal administrative request to be released from the SHU.  Adam can appeal this denial to the regional office.

Lieutenant Best knows that Adam has requested a cell mate in the SHU.  Best testified that a decision as to whether that will be allowed has not yet been made.[8]  Best assumes that the second threat assessment will play a part in the decision as to whether Adam gets a cell mate.

Lieutenant Best testified that Adam has access to the law library in the SHU, but Adam wants access to the law library in general population.  Best does not know the difference between the two.

Lieutenant Best testified that there are three inmates, including Adam, who are in administrative detention in the SHU for their own protection.  Neither of the other two

---

[8] In responding to Adam's formal objection to being confined in the SHU, the warden granted this request, subject to the availability of a suitable cell mate.

16

inmates has been in the SHU for as long as Adam.  One has been in the SHU for approximately two weeks, and the other for approximately two months.  Neither has requested to be returned to the general population and neither has complained about the conditions in the SHU.  Both of them are in administrative detention at their own request.  Neither of them is in the recreation room program.  There are eight persons in the recreation room program and seven of them are pretrial detainees.

Adam has not expressed any fear of harm if he is placed in the general population.  Co-defendant Kelly is in the SHU because there is a threat on his life and also because he has attempted murder on a law enforcement officer.  Kelly did not request to be in the SHU.

D.  **Exhibits**

Government Exhibit 1 consists of the documents containing information about the threat on Adam's life, upon which Captain Felz relied in placing Adam in administrative segregation.  The government has provided an unredacted copy of this exhibit *in camera* to the Court.  The government has filed a redacted copy of the exhibit (DE # 71).

Government Exhibit 2 is an intake screening form which states that Adam received an admission and orientation handbook when he entered FDC Miami.

Defense Exhibit 2 is a composite exhibit of the BOP forms that Adam has filed as a request for administrative remedies, including the BOP 9 form which Adam filed on September 18, 2007.  In the September 18, 2007 form, Adam requested a cell mate; to be allowed to make legal calls; to receive "some privileges" and to be allowed "all access"

to the law library.[9]

Defense Exhibit 3 is Warden Rathman's October 5, 2007 response to Adam's September 18, 2007 BOP 9.  The warden denied Adam's request for release from the SHU, but granted some of Adam's other requests, specifically stating that a suitable cell mate is being sought for Adam.  The warden indicated that Adam had received access to the SHU law library on September 28, 2007 and October 1, 2007, and that he could access the SHU law library by submitting an inmate request to staff.  The warden denied Adam's request for some privileges, stating that Adam would continue to receive the privileges outlined by BOP policy. The warden also indicated that Adam had made numerous legal calls on September 18, 2007, September 20, 2007, September 26, 2007 and October 3, 2007, but that legal calls are a supplement to attorney visits and legal correspondence.

Defense Exhibit 4 is a September 13, 2007 prescription from the FDC Miami pharmacy for Adam to take two tablets of 10 mg Buspirone twice daily.  The parties agree that Buspirone is an antianxiety agent.[10]

Defense Exhibits 5 and 6 are pages from Ozone Magazine from the Memorial Day 2007 and August 2007 editions, respectively, which mention Adam and contain his photograph.

---

[9] Defense Exhibit 1 appears to be a transcript of an interview that Lieutenant Best conducted of Adam on August 22, 2007.  *See* DE # 80, Transcript of September 7, 2007 hearing, at 28.

[10] Neither party has provided any evidence concerning the condition of Adam's mental health, including but not limited to testimony by the mental health professional who prescribed the Buspirone for Adam.

IV.  <u>Analysis</u>

A.  <u>This Court Does Not Have Jurisdiction Over Adam's Claims Because
Adam Has Not Exhausted His Administrative Remedies</u>

The undersigned finds that this Court does not have jurisdiction over Adam's claims because Adam has not exhausted his administrative remedies.  The Eleventh Circuit has specifically held that an inmate must exhaust administrative remedies before filing a habeas corpus petition under 28 U.S.C. § 2241, such as Adam has filed here.  *See Skinner v. Wiley*, 355 F.3d 1293, 1295 (11th Cir. 2004).  The courts do not have the discretion to waive the exhaustion requirement even if exhaustion would be futile or inadequate.  *See Harris v. Garner*, 190 F.3d 1279, 1285 (11th Cir. 1999).[11]

Moreover, even if this Court had the discretion to waive the exhaustion requirement, because exhaustion would be futile, there is no evidence in this record that exhausting administrative remedies here would be futile.  While the warden denied Adam's administrative request to be placed in the general population, he did grant other aspects of Adam's administrative request.  Adam's counsel stated at the October 12, 2007 hearing that he intended to help Adam appeal the warden's denial of administrative relief to the next level.  Indeed, the history of this motion indicates that it is not futile to require Adam to exhaust his administrative remedies before seeking relief from this Court.  A number of Adam's initial complaints have been resolved administratively.  Adam now has: a battery operated radio; access to the law library in the SHU; access to vegetarian food and canned fish, and visits from family.  The warden is presently evaluating whether Adam can have a cell mate.  Moreover, a further evaluation of the threat against Adam

---

[11]  Adam concedes that *Harris v. Garner*, 190 F.3d 1279, 1285 (11th Cir. 1999) is binding Eleventh Circuit precedent that this Court must follow (DE # 127 at 5-6).

was underway at the time of the final evidentiary hearing.

Therefore, Adam's assertion that he does not need to exhaust his administrative remedies because he is not raising a complaint under the PLRA about prison conditions, but his assignment to the SHU, must fail.

### B.  In Any Event, Adam's Placement In Administrative Detention, At This Time, Is Not Punitive

The undersigned finds that Adam was placed in administrative detention in the SHU because the BOP found that a credible threat exists against his life, which would result in possible danger to Adam, other inmates and institution staff if Adam was placed in the general population.  *See* 28 C.F.R. § 541.22 (a) & (a)(3) (allowing a pretrial detainee to be placed in administrative detention when his presence in the general population poses a serious threat to the inmate, staff, other inmates, or to the secure and orderly operation of the institution).

The government has a legitimate interest in managing its detention facilities and in maintaining the secure and orderly operations of its detention facilities.  *See Bell v. Wolfish*, 441 U.S. 520, 540, 546-47 (1979).  A pretrial detainee may be placed in administrative detention as long as the placement is not punitive.  *Id.* at 535.  In determining whether the pretrial detainee's placement in administrative detention is punitive, the reviewing court must consider whether the placement is reasonably related to a legitimate government objective.  *Id.* at 539.  The Supreme Court recognized that the security of the institution and the preservation of internal order and discipline are essential correctional goals.  *Id.* at 546-47.  The Court also noted that the courts are not to second guess prison administrators, but are simply supposed to determine whether a pretrial detainee's placement in administrative detention is punitive.  *Id.* at 544.  There is a

presumption of reasonableness attached to prison security regulations. *See Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995).  Extremely harsh conditions in administrative segregation can amount to a violation of a protected liberty interest if it constitutes an atypical and significant hardship when compared to the ordinary conditions of imprisonment experienced by a pretrial detainee.  *See Magluta v. Samples*, 375 F.3d 1269, 1282 (11th Cir. 2004).

The government has provided evidence that it based its assignment of Adam to the SHU on information the Mexican Mafia has placed a "contract" on Adam's life, because Adam and two associates were involved in a drug deal with a member of the Mexican Mafia which ended up with the execution style murder of the Mexican Mafia member and with Adam and his two associates in possession of both the money and the drugs.  The undersigned has examined the documents containing the information upon which the government relies.  After a careful review of these documents, the undersigned finds that the evidence of the threat, while not overwhelmingly strong, is credible.

At the evidentiary hearings, Captain Edward Felz, the Chief of Correctional Services at FDC Miami and Lieutenant Brian Best, the lieutenant in charge of FDC Miami's SHU, testified that in light of this threat, Adam could not safely be placed in the general population at FDC Miami because, not only might any member of the Mexican Mafia seek to kill Adam,[12] but any member or associate of any other gang might try to kill Adam to gain favor with the Mexican Mafia.  Best testified that more than 50% of the inmates at FDC Miami fell into this category.  Best and Felz also testified that FDC Miami was a particularly unsafe place for Adam to be placed into the general population because of its

---

[12] At the October 12, 2007 hearing, Lt. Best testified that there were presently three members of the Mexican Mafia incarcerated at FDC Miami.

transient population, with approximately 10 new inmates arriving every weekday and up to 5 new inmates arriving every weekend day.  Thus, the evidence in the record established that Adam was placed in administrative detention based on a credible threat to his life, which would result in physical danger to Adam, to other inmates and to staff if Adam was placed in the general population.  This is a legitimate government objective, and is a legitimate penological reason for Adam's designation to the SHU.  The alleged deprivations do not rise to a level requiring the Court's intervention in the operation of the prison as it relates to Adam.

Furthermore, the record does not contain any evidence that Adam was placed in administrative detention as a punishment or for punitive reasons.  While Adam has established that the conditions in administrative detention are more restrictive that the conditions in the general population, being subject to restrictive conditions, based on a legitimate government objective, does not amount to punishment.  *See Bell v. Wolfish*, 441 U.S. at 540.

The undersigned notes that at this time Adam has been in administrative detention in the SHU for less than six months, and it is not clear that he will have been in administrative detention for more than six months by the time his trial starts.[13]  This Court has implied that more than six months of pretrial detention in the SHU for administrative segregation is presumptively punitive.  *See U.S. v. Rosenstein*, Case No. 04-21002-CR-DIMITROULEAS, DE # 42 at 1-2, ¶¶2-4 (July 20, 2006)*; see also U.S. v. Basciano*, 369 F.Supp.2d 344, 351 (E.D.N.Y. 2005).  We are not yet at that point, and

---

[13] As of January 24, 2008, Adam will have been in pretrial detention in the SHU for six months.  His trial is presently set to begin between January 7, 2008 and April 7, 2008 (DE # 142).

further administrative review of Adam's conditions of pre-trial confinement may alleviate some of his complaints before that point is reached.

**C. The Record Does Not Contain Any Evidence That Adam's Placement In Administrative Detention Is Affecting His Mental State or His Ability To Prepare For Trial**

In Adam's August 8, 2007 motion, Adam stated that his presence in the SHU is affecting his mental state, which he alleges is deteriorating, and that this might interfere with his ability to prepare for trial (DE # 19 at 7-8).[14]  Similarly, at the September 27, 2007 hearing, Adam's counsel stated that Adam's prior counsel had told him that Adam's mental condition was deteriorating because he was in administrative segregation (DE # 80 at 6, 13-14).  However, since there is no evidence in the record that Adam's placement in the SHU is affecting his mental state or his ability to prepare for trial, these claims have not been substantiated.

The only evidence in the record concerning Adam's mental state is a September 13, 2007 prescription from the FDC Miami pharmacy for Adam to take two tablets of 10 mg Buspirone, an antianxiety drug, twice daily, which was admitted at the October 12, 2007 evidentiary hearing (Defense Exhibit 4; DE # 126 at 60-64).  The record contains no evidence that Adam's mental health is deteriorating, and/or that this deterioration is interfering with his right to counsel.  Adam did not testify at the evidentiary hearing concerning this issue.  Adam also did not call as a witness either the mental health professional at FDC Miami who prescribed Buspirone for Adam or any expert witness to testify concerning Adam's mental health.  Finally, Adam has not requested a competency

---

[14] At the September 12, 2007 hearing, Adam's then-counsel, Mr. Srebnick, conceded that Adam had access to counsel and that Adam was not raising a complaint about his ability to confer with counsel (DE # 139 at 13-14).

or psychological examination.[15]

Therefore, based upon a careful review of the record and based upon the arguments of the parties, it is hereby

**RECOMMENDED** that Defendant Ali Louis Adam's Motion For Immediate Relief From Solitary Confinement and For Modification of His Conditions of Pretrial Detention (07-20577-CR-HUCK, DE # 19) be **DENIED without prejudice** and that Adam's Petition For A Writ of Habeas Corpus (07-22173-CIV-HUCK, DE # 1), be **DISMISSED without prejudice for failure to exhaust administrative remedies**.

Pursuant to S. D. Fla. Magistrate Judge Rule 4(b), the parties shall have ten days from the service of this Report and Recommendation to file written objections to this Report and Recommendation.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.), *cert. denied*, 488 U.S. 958 (1988).

**DONE AND SUBMITTED** in chambers at Miami, Florida, on November 16, 2007.

_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished to:
The Honorable Paul C. Huck, United States District Judge
All counsel of record

_____

[15] At the September 27, 2007 hearing, the undersigned raised these issues with Adam's counsel, specifically the lack of a motion for a competency examination and the statement by prior counsel, attorney Srebnick, at the September 12, 2007 hearing that there were no restrictions on Adam's ability to consult with counsel (DE # 80 at 20-22).

24